224 N.J. Super. 686 (1988)
541 A.2d 271
BARBARA SYKES, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX FOR THE ESTATE OF WILLIAM SYKES, AND BARBARA SYKES, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
PROPANE POWER CORP., PROPANE POWER AND HEAT CORP., MCKESSON ENVIROSYSTEMS COMPANY, AS SUCCESSOR OF INLAND CHEMICAL CORPORATION, NIMCO SHREDDING CO., RAYMOND M. GILLIAM, JOHN R. BERGER, B.W. FLOERSCH, ZOOK ENTERPRISES, INC., VULCAN MATERIALS COMPANY, AND MCKESSON CORPORATION, DEFENDANTS, AND SULLIVAN ENGINEERING GROUP, INC., AND LEROY E. SULLIVAN, III, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 12, 1988.
Decided May 6, 1988.
*688 Before Judges MICHELS, GAYNOR and ARNOLD M. STEIN.
Edward G. D'Alessandro argued the cause for appellants (D'Alessandro, Sussman, Jacovino & Mahoney, attorneys; Edward G. D'Alessandro, of counsel and on the brief).
Andrew J. Carlowicz, Jr. argued the cause for respondents (Hoagland, Longo, Oropollo & Moran, attorneys; Andrew J. Carlowicz, of counsel; Bruce Alan Magaw, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiffs Barbara Sykes, Administratrix Ad Prosequendum and Administratrix of the Estate of William Sykes and Barbara Sykes, individually, appeal from a summary judgment of the Law Division entered in favor of defendants Sullivan Engineering Group, Inc. (Sullivan Engineering) and Leroy Sullivan, III (Sullivan) and from an order denying her motion for reconsideration in this action seeking to recover damages for the wrongful death of William Sykes (Sykes). Although plaintiff was never formally married to Sykes, she also appeals from two trial court orders entered in favor of defendants McKesson Corporation and Zook Enterprises, Inc. that dismissed all claims asserted by her individually for loss of consortium and for damages under the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq., as the purported "wife" of the decedent.
The facts giving rise to this appeal may be summarized briefly as follows. During 1978-1979, Sullivan worked for Environics, Inc. (Environics), where his primary responsibility was assisting industrial facilities to comply with environmental regulations. At this time, he was assigned by Environics to assist defendant Inland Chemical Corporation (Inland Chemical) in obtaining an operating permit from the New Jersey Department of Environmental Protection (DEP) for its chemical recovery plant in Newark, New Jersey. As manager of the Inland Chemical project, Sullivan was required to compile data pertaining *689 to the existing operation of the plant in order to bring it into compliance with newly-promulgated DEP regulations. This data was embodied in a comprehensive Engineering Plan prepared and sealed by Sullivan, as a licensed professional engineer, on April 16, 1979. Thereafter, Inland Chemical received a temporary operating permit from the DEP which ran from June 27, 1980 to March 31, 1981.
After the temporary DEP permit expired, defendant McKesson Envirosystems Company (McKesson), a wholly-owned subsidiary of defendant McKesson Corporation, acquired Inland Chemical on December 1, 1981. McKesson thereupon began operating the Newark chemical recovery plant without first obtaining authorization from the DEP. Following detection and intervention by the DEP, a proposed administrative consent order was drawn up which conditioned the continued operation of the plant upon proof of compliance with the applicable provisions of N.J.A.C. 7:26-7.1 et seq. through 12.1 et seq. (regulations pertaining to the New Jersey Division of Waste Management). In pertinent part, McKesson was required to submit a series of detailed drawings revealing the layout and location of the facilities involved in the chemical recovery process.
On April 12, 1982, McKesson entered into a contract with Sullivan, who had since left Environics to form Sullivan Engineering, to assist in the development of these drawings. In accordance with the proposed order, Sullivan prepared and signed Topographic Plot and Storage Tank Location Plan Drawings which were then sent by McKesson to the DEP on April 19, 1982. Additionally, the Engineering Plan of April 16, 1979, as well as an Environmental Impact Statement which Sullivan had originally developed for Inland Chemical were re-submitted by McKesson at this time. Finally, with the assistance of William Shortreed of McKesson, Sullivan took photographs of the processing systems and then prepared "process flow diagrams" depicting the schematic relationship between the components in each system. These drawings were submitted to *690 McKesson's counsel on August 11, 1982, two days after the final administrative consent order became effective.
On October 10, 1982, Sykes, a McKesson employee, sustained fatal injuries when a chemical distillation unit in the plant exploded. The causes and environmental impact of the explosion and fire which ensued were the subject of an intensive investigation by McKesson, culminating in a 27-page "Final Accident Report" dated December 23, 1982. According to this report, the "T-1" distillation unit was being used to recover dimethyl sulfoxide (DMSO) from an industrial waste product "stock" at the time the explosion occurred. The probable cause of this explosion was determined to be "excessive acidity [in the stock] leading to an uncontrollable decomposition of DMSO ..." in the unit reboiler. In large part, the accident was attributed to the operators' failure to make regular PH analyses of the stock and to take prompt corrective measures when the system began to malfunction.
Thereafter, plaintiff instituted this action sounding in negligence and strict liability in tort against McKesson, Sullivan Engineering and Sullivan, among others, to recover damages for the wrongful death of Sykes, her cohabitant of 22 years and father of their four children. Plaintiff based her theories of liability on a report prepared by her consulting engineer, Ralph Powell (Powell), who was of the opinion that the probable causes of the accident were (1) operational negligence of the employee-operators in failing to test the acidity of the chemical "feed stock"; (2) operational negligence of the employee-operators in failing to follow proper emergency procedures once the system began to malfunction; (3) design negligence in failing to equip the unit with an interlocking monitor/alarm/shutdown system, which even in the presence of employee-operator ignorance would have achieved the safe shutdown of the unit; (4) design negligence in improperly using a "single four-inch rupture disk" too small to handle the pressure within the unit, and (5) absence of a hazard evaluation study relevant to the unit's use as a DMSO recovery system. Powell was of the opinion *691 that these five categories of error were "traceable" to all of the defendants who were involved in the design of the distallation unit, employee training programs and sampling protocols, as well as the process system's instrumentation, interlock monitor/alarm/shutdown capabilities and safety relief system. Powell opined that these individuals appeared "to comprehend", among others, Sullivan and Sullivan Engineering.
Following completion of pretrial discovery, Sullivan Engineering and Sullivan moved for summary judgment. Judge Bedford in the Law Division granted the motion, holding that their work was not causally related to the explosion. In short, he found that Sullivan had been engaged solely for the purpose of preparing the drawings and documents required by the DEP and had not been hired to go through the plant as a safety engineer and advise McKesson about correcting hazards unrelated to environmental concerns. After Sullivan Engineering and Sullivan were dismissed from the suit, defendants McKesson and Zook Enterprises, Inc. filed motions to strike plaintiff's individual damages claims on the ground that although she was living with Sykes as man and wife, they were not legally married. Judge Villanueva in the Law Division granted these motions and dismissed all damage claims asserted by plaintiff individually against the remaining defendants. He held that plaintiff could not "recover (1) for loss of consortium because there was no marriage relationship; or (2) for her death claims because she falls outside any applicable classification under N.J.S.A. 2A:31-4 et seq." Sykes v. Zook Enterprises, Inc., 215 N.J. Super. 461, 463 (Law Div. 1987).
Plaintiff now appeals from the summary judgment entered in favor of Sullivan Engineering and Sullivan, the subsequent order denying her motion for reconsideration and from the orders dismissing her individual damage claims.

I.
We turn first to the summary judgment entered in favor of Sullivan and Sullivan Engineering. The law is well-settled *692 that "[o]ne who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities." Levine v. Wiss & Co., 97 N.J. 242, 246 (1984), citing Restatement (Second) of Torts § 299A (1965). With respect to the community of professional engineers in this State, our Legislature has provided certain thresholds of competency and accountability to the public. Under N.J.S.A. 45:8-27, a license to practice professional engineering is required "[i]n order to safeguard life, health and property, and promote the public welfare...." Thereafter, any "[p]lans, specification [sic], plats and reports" issued by the professional engineer must bear an authorized seal of licensure under N.J.S.A. 45:8-36.
Here, plaintiff contends that Sullivan breached a duty of care owed to Sykes by placing his seal upon documents reflecting an unsafe and negligently developed chemical processing system. In particular, plaintiff points to the fact that although Sullivan was hired by Inland Chemical as an environmental consultant, the "Engineering Plan" which he issued on April 16, 1979 and which was re-submitted in 1982 by McKesson included such topics as "Explosion and Disaster Plan," "Serious Injury Plan", and "Safety Standards and Policies" under the general heading of "Risk Analysis." Furthermore, although Sullivan prepared and affixed his seal to a "process flow diagram" of the "T-1" chemical distillation unit that exploded, he admitted in deposition that he had no background in chemical engineering, and did not know anything about (1) the types of chemical solvents that were processed through the T-1 unit; (2) the frequency or nature of the inspection procedures employed; (3) the sizing of the rupture discs that were used in the unit's reboiler or (4) any of the "design criteria [or] choices that were made."
In sum, it is argued that even if Sullivan were primarily qualified as an "environmental engineer", and hired by McKesson as such, the drawings which he prepared and sealed were inextricably related to the chemical recovery process which *693 caused the explosion. Therefore, she argues that since the DEP relied upon these documents in authorizing McKesson to continue operating the plant on the day the explosion occurred, a jury could have found that Sullivan's failure to detect the inherent problems in the system constituted a proximate cause of decedent's death. We disagree.
As the New Jersey Supreme Court observed in DiCosala v. Kay, 91 N.J. 159, 175 (1982):
... the key to duty depends upon the concept of foreseeability based upon ordinary human experiences. This does not require a specific forecasting of particularly identifiable victims or a precise prediction of the exact harm that may result from the conduct. Rather, we have recognized that a party may be liable to persons who fall normally and generally within a zone of risk created by the particular tortious conduct.
Thus, if Sullivan had been hired to prepare a report for the DEP concerning potential mechanical malfunctions, employee training deficiencies or safety hazards involved in the chemical recovery process used by McKesson, he would have had a duty to detect and prevent the very types of problems which occurred in this case. Had the DEP then issued a temporary operating permit based upon Sullivan's failure to foresee, for example, the potential problem involved with a four inch rupture disc, grounds for liability would exist even if Sullivan were strictly an environmental engineer by profession. Under such circumstances, the misfeasance would have placed the decedent within a foreseeable "zone of risk."
Once again, however, it is necessary to consider whether "[t]he events here transgress the judicial line beyond which liability should not be extended as a matter of fairness or policy." Jensen v. Schooley's Mountain Inn, 216 N.J. Super. 79, 82 (App.Div. 1987) certif. den. 108 N.J. 181 (1987). As explained by the New Jersey Supreme Court in Goldberg v. Housing Authority of Newark, 38 N.J. 578, 583 (1962):
The question is not simply whether a[n] ... event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.
*694 Although all engineers have a professional obligation to see that the work they do is accurate and in conformance with accepted standards of care, the duty to foresee and prevent a particular risk of harm from materializing should be commensurate with the degree of responsibility which the engineer has agreed to undertake. An environmental engineer may in certain circumstances be called upon to evaluate the safety of a chemical processing plant. However, Sullivan was not retained to do that here. He was only retained to prepare a basic graphical layout of the existing processing systems for the DEP. Sullivan was not asked to evaluate or upgrade McKesson's "stock" testing procedures or employee training methods, nor did he have any input into the decision to run the T-1 distillation unit without a safety interlock or to use a four inch rupture disc in the reboiler. Under the circumstances, it would go against all settled principles of tort law and considerations of fairness and policy to visit liability upon Sullivan for any failure in the plant or its operating procedures simply because he affixed his seal to several generalized drawings depicting the allegedly defective components involved.
Here, it is evident from correspondence between McKesson and the DEP that the drawings prepared by Sullivan were submitted to satisfy the requirements of paragraph 11 of the final administrative consent order of the DEP. The provisions contained in this paragraph are of particular significance. With the exception of subsection (i), which requires McKesson to specify the methods to be used to monitor the storm and sanitary sewer discharge points, paragraph 11 calls only for layout locations, profile views, elevations and cross-sections of the existing facilities. Paragraph 11 of the order did not require McKesson to assess, approve or upgrade the chemical recovery process or its attendant safety features in any way. Rather, Sullivan was retained simply to prepare generalized drawings of the processing system components in order to show how the chemicals were carried, stored and discharged.
*695 Moreover, although Sullivan's original Engineering Plan may have included such topics as "Explosion and Disaster Plan", it was submitted by McKesson solely for the purpose of complying with paragraph 13 of the final administrative consent order. Like paragraph 11, paragraph 13 has nothing to do with the safety of the chemical recovery process. It simply required McKesson to provide an engineering plan for adequate diking, piping, pumps and valves at designated vehicle loading and unloading areas, and the methods and materials to be used for constructing the containment areas. Given the specific purpose for which Sullivan was hired, and the limited scope of the order which he was required to follow in preparing the documents for McKesson, the trial court properly granted summary judgment in favor of these defendants.
Accordingly, we affirm the summary judgment in favor of Sullivan Engineering and Sullivan and the order denying plaintiff's motion for reconsideration under review.

II.
We are also satisfied that Judge Villaneuva in the Law Division properly dismissed plaintiff's individual damage claims and affirm the challenged orders substantially for the reasons expressed by him in his written opinion in Sykes v. Zook Enterprises, Inc., 215 N.J. Super. 461 (Law Div. 1987). In Sykes v. Zook Enterprises, Inc., supra, the trial court dismissed plaintiff's individual claims for loss of consortium and damages under the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq. This decision was grounded on the fact that plaintiff and Sykes were never formally married in a civil or religious ceremony. As found by the trial court:
Barbara Sykes and William Sykes held themselves out as married, but were never married in a formal or religious ceremony; they owned certain property in common as "husband and wife"; they resided together and lived as husband and wife; Barbara Sykes bore four children to William Sykes and they and their offspring resided together; Barbara Sykes was named as spouse and beneficiary on a policy of insurance of William Sykes; Barbara Sykes was dependent on William Sykes. Barbara Sykes and William Sykes had lived together for 24 *696 years since Barbara Sykes was 18-years-old. Barbara Sykes gave birth to William Sykes' namesake, William Lewis Sykes, Jr., and one of their three daughters was named after Barbara Sykes and Barbara Sykes' sister, Ann. All of the children in common were given the surname "Sykes," as is the usual practice in the case of children born in wedlock.
However, Barbara Sykes did not list herself as a spouse, heir or next of kin in her complaint for administration filed in the Surrogate's Court. Only the four children were listed as next of kin and plaintiff swore that there were "no other heirs or next of kin known to the plaintiff." Decedent William Sykes was also described as "single  never married." Notwithstanding those sworn representations, plaintiff proceeded to allege in this action, brought pursuant to letters of administration issued to her, that she was "next of kin" and "purported wife" of William Sykes. [Id. at 464].
On appeal plaintiff contends that the trial court's ruling with regards to her individual wrongful death claim amounted to a denial of equal protection to the Sykes children. This contention is premised upon the fact that plaintiff has been totally disabled since suffering a stroke in 1976 and requires continuous medical care. She argues that if she is precluded from recovering in her own behalf under the Wrongful Death Act, N.J.S.A. 2A:31-1 et seq., the costs of her medical care will ultimately have to be borne by her four children. Although our Supreme Court has determined that children who are not born to a legitimate marriage may nevertheless recover for the wrongful death of a parent, Schmoll v. Creecy, 54 N.J. 194 (1969), and the Sykes children did in fact institute individual claims, plaintiff nevertheless contends that these claims do not afford them the same remedy which legitimate children would enjoy under the Act, since the latter would not have to bear the additional costs of their dependent parents.
The trial court's decision was based upon a similar Law Division case, Cassano v. Durham, 180 N.J. Super. 620 (Law Div. 1981). In Cassano, the court held that one who maintains a "live-in" relationship with another out of wedlock may not recover pecuniary damages for the partner's accidental death under the Wrongful Death Act because of the language contained in N.J.S.A. 2A:31-4. In pertinent part, this statute provides that "[t]he amount recovered in proceedings under this chapter shall be for the exclusive benefit of the persons entitled *697 to take any intestate personal property of the decedent ..." [Emphasis added]. At that time, N.J.S.A. 3A:2A-34 provided only for the intestate succession of a decedent's property to the "surviving spouse." In view of the Legislature's omission of a similar intestacy provision for unmarried cohabitants, and its express refusal to recognize the validity of common law marriages, N.J.S.A. 37:1-10, the Cassano court refused to extend the availability of recovery under the Wrongful Death Act beyond persons who are legally married. This would accord with the recognized definition of "spouse" as a "man or woman joined in wedlock, a married person." Lopez v. Santiago, 125 N.J. Super. 268, 270 (App.Div. 1973), quoting Webster's Third New International Dictionary (1961) at 2208 (injured passenger who bore 4 children, lived with and used name of uninsured driver was not "spouse" within meaning of N.J.S.A. 39:6-70, and thus was not barred from recovering from the Unsatisfied Claim and Judgment Fund).
Although N.J.S.A. 3A:2A-34 has since been repealed, it has been re-codified verbatim in N.J.S.A. 3B:5-3. Thus, since the right to recover under the Wrongful Death Act is derived from the statutory laws of intestacy, which apply exclusively to "surviving spouses", plaintiff's status as an unmarried cohabitant of Sykes bars her individual claim. Nonetheless, plaintiff urges that additional circumstances exist here which compel a different result than that reached in Cassano. In particular, plaintiff contends that her children are being denied equal protection under the law because the exclusion of unmarried cohabitants from the reach of N.J.S.A. 2A:31-1 et seq. "unconstitutionally relegates the illegitimate children of William Sykes to a lifetime supporting an ailing, hypertensive, totally disabled mother without an estate in circumstances in which legitimate children would not be so burdened." This argument, however, ignores the letter and intent of the Wrongful Death Act and the rights which have been accorded to illegitimate children thereunder.
*698 Initially, it is first necessary to point out that illegitimate children are entitled to recover in their own right under the Wrongful Death Act. In Schmoll v. Creecy, supra, the Supreme Court reversed an Appellate Division ruling that an illegitimate child could recover for the wrongful death of its mother but not the wrongful death of its father unless legitimized under N.J.S.A. 3A:4-7 (now repealed). This statute required the illegitimate child to be treated as a legitimate child of the mother for purposes of descent and distribution under the laws of intestacy, but only as a legitimate child of the father if the parents subsequently married and recognized the child as their own. The application of this statute to preclude illegitimate children from recovering for the wrongful death of their father was held to constitute a denial of equal protection under the Federal Constitution since:
the underlying principle must be that when children suffer tortious injury by the wrongful death of a parent, their legitimacy is irrelevant to the tortfeasor's liability, and hence it is invidious to grant a remedy to the legitimate and withhold it from the illegitimate child. [54 N.J. at 201. Relying upon Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968)].
This rationale would apply with equal effect to the counterpart of N.J.S.A. 3A:4-7 under Title 3B, N.J.S.A. 3B:5-10, which imposes similar conditions of legitimacy upon a child born out of wedlock for purposes of intestate succession from the father. As such, the status of the Sykes children does not bar the individual claims which they have asserted for the wrongful death of their father.
Furthermore, it is significant that the Act does not differentiate between legitimate and illegitimate survivors as to the type of damages available. Rather, N.J.S.A. 2A:31-5 simply provides that:
In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent. [Emphasis Added].
Our Supreme Court has defined the measure of damages available under this statute as the:

*699 "deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased." McStay v. Przychocki, 7 N.J. 456, 460 (1951); Carter v. West Jersey & Seashore R.R. Co., 76 N.J.L. 602, 603 (E. & A. 1908). The amount of the recovery under this standard is based upon the contributions, reducible to monetary terms, which the decedent reasonably might have been expected to make to the survivors, and is not related to their needs. [Dubil v. Labate, et al., 52 N.J. 255, 259 (1968)]; see also Curtis v. Finneran, 83 N.J. 563, 570 (1980).
Since the recovery of pecuniary damages under the Act does not depend upon the needs of the claiming survivors, plaintiff cannot successfully contend that a denial of equal protection would occur if her children were required to provide for her future medical care out of the damages they may recover. As the trial court observed "these asserted `needs' of survivors are as unavailable to legitimate children as they would be to illegitimate children." Sykes, 215 N.J. Super. at 469-470. This is also reflected in the express language of N.J.S.A. 2A:31-4, which provides that "[t]he amount recovered in proceedings under this chapter shall be for the exclusive benefit of the persons entitled to take any intestate personal property of the decedent ..." [Emphasis added]. Thus, unlike the circumstances encountered in Schmoll, both legitimate and illegitimate children are precluded from recovering damages for future financial responsibilities which they may incur for their own dependents.
Since the Wrongful Death Act cannot be said to discriminate against the children of plaintiff in terms of the type of damages they are entitled to recover, the only question remaining is whether the statutory exclusion of plaintiff as an unmarried cohabitant is constitutionally valid in itself. The Fourteenth Amendment to the Federal Constitution and Article 1, paragraph 1 of the New Jersey Constitution share a similar objective: each "seeks to project against injustice and against the unequal treatment of those who should be treated alike." Barone v. Dept. of Human Services, 107 N.J. 355, 367 (1987), quoting from Greenberg v. Kimmelman, 99 N.J. 552, 568 (1985). Stated another way:

*700 "The equal protection of the laws means that no person or class of persons shall be denied the protection of the laws enjoyed by other persons or classes of persons under similar conditions and circumstances, in their lives, liberty, and property, and in the pursuit of happiness, both as respects privileges conferred and burdens imposed." [Levine v. Institutions & Agencies Dept. of N.J., 84 N.J. 234, 256 (1980), quoting from Washington National Ins. Co. v. Bd. of Review, 1 N.J. 545, 553 (1949)].
See also Domenick v. Taxation Div. Director, 176 N.J. Super. 121, 128 (App.Div. 1980).
In analyzing equal protection claims under the Fourteenth Amendment, our courts have adopted a three tier approach. Where a statutory classification implicates a "fundamental right" or "suspect class", the statute must, under the "strict scrutiny" test, further a compelling state interest by the least restrictive means. Barone, 107 N.J. at 365 citing Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). A suspect class has been defined as one:
... saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. San Antonio School Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16, 40 (1973). [State v. Senno, 79 N.J. 216, 226 (1979)].
Additionally, "strict scrutiny" will be triggered when the classification is based upon an "immutable characteristic determined solely by the accident of birth." Frontiero v. Richardson, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583, 591 (1973); Senno, 79 N.J. at 226.
Under the "second tier" of this analysis, statutes which indirectly affect "fundamental rights" or implicate "semi-suspect classes" must be "substantially related" to important government interests. Barone, 107 N.J. at 365-366. This "intermediate scrutiny" standard is most often applied in cases involving illegitimacy and gender-based discrimination. See generally, Trimble v. Gordon, 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) and Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).
Finally, if neither strict nor intermediate level scrutiny applies, the complainant must demonstrate that the statute is not *701 rationally related to the achievement of a legitimate state objective. Barone, 107 N.J. at 365, citing Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Under the "rational basis" standard, the scope of judicial review of legislative classification is extremely limited:
The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal protection clause forbids only invidious discrimination. Morey v. Doud, 354 U.S. 457, 463-464, 77 S.Ct. 1344, 1 L.Ed.2d 1485, 1490 (1957); Williamson v. Lee Optical of Okla., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563, 573 (1955); New Jersey Restaurant Ass'n v. Holderman, 24 N.J. 295, 300-302 (1957). [David v. Vesta Co., 45 N.J. 301, 314-315 (1965)]. See also Barone, 107 N.J. at 369-370.
"In the absence of invidious discrimination, however, a court is not free under the aegis of the Equal Protection Clause to substitute its judgment for the will of the people of a State as expressed in the laws passed by their popularly elected legislatures." Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745-46, 60 L.Ed.2d 269 (1979); Domenick, 176 N.J. Super. at 129.
Although the evaluation of equal protection claims under the State Constitution entails a more flexible "balancing test" which may provide greater protections, Barone, 107 N.J. at 368, the criteria involved are essentially the same as those applied in the Federal three-tier test. "Both tests consider the nature of the individual rights affected by the governmental action being challenged, the importance of the governmental interests being furthered, and the degree to which the challenged restriction is necessary to achieve those interests." Ibid.
Applying these principles here, it is clear that the preclusion of unmarried cohabitants from recovery under the Wrongful Death Act does not offend the Equal Protection clause of the *702 Fourteenth Amendment or its implicit presence in the State constitution. As noted in Parham, 441 U.S. at 358, n. 12, 99 S.Ct. at 1749 n. 12, where the Supreme Court upheld a Georgia statute denying a natural father the right to sue for his illegitimate child's wrongful death, "[it] cannot seriously be argued that a statutory entitlement to sue for the wrongful death of another is itself a `fundamental' or constitutional right." Moreover, the policy considerations involved in Schmoll v. Creecy are noticeably absent. Unlike the illegitimate child who is not at all responsible for the immutable stigma which attaches at birth, persons who voluntarily choose not to marry cannot be considered part of a suspect or quasi-suspect class. Rather, under the three tier approach outlined above, a rational basis exists for excluding unmarried cohabitants from the scope of the Wrongful Death Act, whether or not their children may be indirectly affected.
Although the United States Supreme Court has held that statutory classifications which directly and substantially interfere with the right to marry must be subject to rigorous scrutiny, Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed". Id., 434 U.S. at 386, 98 S.Ct. at 681, citing Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) (Where there existed a rational basis for Social Security Act provision terminating the benefits collected by plaintiff, a disabled dependent child, upon his marriage to spouse similarly disabled but not entitled to benefits under the Act, Court held that principle of equality embodied in due process clause of Fifth Amendment was not violated).
In Vogel v. Pan American World Airways, Inc., 450 F. Supp. 224 (S.D.N.Y. 1978), where plaintiff brought suit individually for the wrongful death of her divorced husband, the federal court for the Southern District of New York, applying California law, reached a conclusion similar to the one reached by the trial court below. As in New Jersey, California's wrongful *703 death act included by reference the laws of intestate succession. Plaintiff advanced an equal protection argument on the grounds that these laws defined as heirs "putative spouses" of void or voidable marriages but did not similarly include "meretricious spouses" such as plaintiff. In rejecting the argument that such an exclusion lacked a rational basis, the court reasoned as follows:
To begin with, the legislature could reasonably have concluded that the failure of meretricious spouses to adopt the responsibility of the marital vows and the legal obligation resulting from a formal marriage ceremony evidenced a lack of permanent commitment which made compensation for loss of monetary support too speculative to calculate. The legislature also could have legitimately found that the distinction between putative and meretricious spouses serves to avoid fraudulent claims and complicated proof at trial: While putative spouses can prove their relationship with the decedent through documentary evidence of their participation in a marriage ceremony, meretricious spouses would have to prove their relationship through more subjective, and therefore more difficult to evaluate, proof. Finally, the legislature could have rationally expected that its refusal to provide statutory property rights to meretricious spouses of its decedents would encourage its citizens to enter into formal matrimony, thereby promoting its recognized state interest in fostering the institution of formal marriage. [Id. at 226].
Accord Aspinall v. McDonnell Douglas Corp., 625 F.2d 325, 328 (9th Cir.1980).
Although here, plaintiff's argument is predicated upon the claim that her children will effectively be discriminated against by virtue of their mother's precluded claim, the underlying rationale is nevertheless the same: because it is "neither illogical nor unjust for society to express its `condemnation of irresponsible liaisons beyond the bounds of marriage'", Parham, 441 U.S. at 353, 99 S.Ct. at 1746-47, our Legislature's refusal to include unmarried cohabitants as beneficiaries under the laws of intestate succession, and thus, the Wrongful Death Act, is a rational means of promoting the institution of formal marriage, a legitimate state interest.
Consequently, in view of the fact that (1) the Wrongful Death Act has not been discriminatorily applied to preclude the individual claims of plaintiff's children, (2) the Act itself provides that all claimants will be entitled to no more than pecuniary *704 damages, and (3) there exists a rational basis for barring plaintiff's individual claims, we hold that neither plaintiff nor her children were denied equal protection under the law.
Accordingly, the orders dismissing plaintiff's individual damage claims are affirmed.