**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1030-20

DONALD D. MCDERMID and
ALLAN MCDERMID, Individually
and as Co-Executors of the Estate of
DONALD MCDERMID, and
Individual Heirs of the Estate of
DONALD MCDERMID,

     Plaintiffs-Appellants,

v.

3M COMPANY, ALLTITE GASKET
COMPANY, INC., AMEC FOSTER
WHEELER PLC, f/k/a FOSTER
WHEELER, LLC, Individually and
as Survivor to a Merger with FOSTER
WHEELER CORPORATION,
AMERICAN DAVIDSON, INC.,
Individually, as Successor to and d/b/a
AMERICAN BLOWER COMPANY,
ASBESTOS CORPORATION LTD.,
Individually and as Successor to
JOHNSON'S COMPANY, BURNHAM
CORP., Individually and as Successor to
BURNHAM BOILER CORP. and as a
Successor to KEWANEE BOILER CO.,
INC., PENN BOILER & BURNER CO.,
SPENCER BOILER CO. and BRYAN
BOILERS, CERTAINTEED

CORPORATION, formerly CERTAINTEED PRODUCTS CORPORATION, Individually and as Successor to KEASBEY AND MATTISON COMPANY and UNISUL, CHICAGO BRIDGE & IRON COMPANY, CLEAVER-BROOKS, INC., COPES-VULCAN, INC., CRANE COMPANY, E&B MILL SUPPLY COMPANY, ELIZABETH INDUSTRIAL SUPPLY, a Division of CHARLES F. GUYON, EXXON-MOBIL CORPORATION, FOSTER WHEELER, LLC, Individually and as Survivor to a Merger with FOSTER WHEELER CORPORATION, GLOBAL MANAGEMENT, INC., Individually and as Successor to PATERSON SUPPLY AND ENGINEERING CO., GOULDS PUMPS, INCORPORATED, IMO INDUSTRIES, INC., as Successor to and f/k/a DELAVAL TURBINE, TRANSAMERICA DELAVAL, and IMO DELAVAL, INDUSTRIAL WELDING SUPPLY, INC., INGERSOLL-RAND COMPANY, JANOS INDUSTRIAL INSULATION CORPORATION, MADSEN & HOWELL, INC. METROPOLITAN LIFE INSURANCE COMPANY, NOTTE SAFETY APPLIANCE COMPANY, RESCO HOLDINGS, INC., Individually but not limited to THE M.W. KELLOGG COMPANY, RESEARCH COTTRELL, INC., RILEY POWER, INC., SAFEGUARD INDUSTRIAL EQUIPMENT

2

CO., UNION CARBIDE CORPORATION, UNIROYAL, INC., Individually and as Successor to UNITED STATES RUBBER COMPANY, INC., UNITED CONVEYOR CORPORATION, URS ENERGY & CONSTRUCTION, VIAD CORPORATION, f/k/a THE DIAL CORPORATION, (Sued Individually and as Successor-in-Interest to GRISCOM-RUSSELL COMPANY), TRANE US, f/k/a AMERICAN STANDARD, INC., Individually as Successor to and d/b/a AMERICAN BLOWER COMPANY, BW/IP INTERNATIONAL CO., f/k/a BORG WARNER INDUSTRIAL PRODUCTS INC., a Former Subsidiary of and Successor to BORG WARNER CORP., BYRON JACKSON PUMPS and UNITED PUMPS & COMPRESSORS, THE FAIRBANKS COMPANY, FLOWSERVE US, INC., Individually and as Successor to VOGT VALVE CO., and WOOLSULATE CORPORATION,

      Defendants,

and

CBS CORP. a Delaware Corporation, f/k/a VIACOM INC., Successor by Merger to CBS CORP., a Pennsylvania Corporation, f/k/a WESTINGHOUSE ELECTRIC CORP., and GENERAL ELECTRIC COMPANY,

      Defendants-Respondents,

_____

3

A-1030-20

Argued January 23, 2023 – Decided July 3, 2024

Before Judges Haas and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2403-15.

Rachel A. Placitella argued the cause for appellants (Cohen, Placitella & Roth, PC, attorneys; Rachel A. Placitella and Eric S. Pasternack, of counsel and on the briefs).

Christopher J. Keale argued the cause for respondent General Electric Company (Tanenbaum Keale LLP, attorneys; Christopher J. Keale, of counsel and on the brief; Joseph D. Fanning, on the brief).

Christopher G. Conley (Evert Weathersby Houff) of the Georgia bar, admitted pro hac vice, argued the cause for respondent CBS Corp. (Tanenbaum Keale, LLP, and Christopher G. Conley, attorneys; Christopher J. Keale of counsel and on the brief; Joseph D. Fanning, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Plaintiffs Donald D. McDermid and Allan McDermid, as co-executors for the estate of their father, Donald McDermid, and individually as his heirs, allege that defendants General Electric Company (GE) and CBS Corp. (CBS), the successor to Westinghouse Electric Corp. (Westinghouse), are liable for

damages arising from Donald's illness and death from mesothelioma.[1]  Plaintiffs allege that Donald's illness and death were caused by his exposure to asbestos when working on turbines designed and constructed by GE and Westinghouse. Those turbines were installed and used at facilities operated by Donald's employer, Public Service Electric & Gas Company (PSE&G).  Specifically, plaintiffs allege GE and Westinghouse, whose engineers were present at PSE&G facilities during the overhauling and repair of the turbines, breached a duty of care to Donald by not taking steps to limit his exposure to asbestos when he participated in those tasks as a PSE&G employee.

The Law Division granted summary judgment in favor of GE and Westinghouse, holding that: (1) neither entity breached a duty of care to Donald, who was not their employee and over whom they did not have supervisory responsibility, during the overhauling and repair of the turbines; and (2) plaintiffs' claims are barred by N.J.S.A. 2A:14-1.1(a), a statute of repose that limits to ten years the time in which a party may assert claims alleging injuries caused by the design and construction of improvements to real property.  The trial court concluded that the asbestos-containing components of the turbines to

---

[1]  We refer to Donald McDermid by his first name so as not to confuse him with his son Donald D. McDermid.  We intend no disrespect.

A-1030-20

which Donald was exposed during the overhauls and repairs were essential elements of the initial design of the turbines, which are improvements to real property. Those custom-designed components, the court found, did not lose their status as improvements under the statute of repose when Donald was exposed to them during the overhauls and repairs of the turbines. Thus, the trial court concluded, Donald's alleged exposure to asbestos during those tasks, which took place decades before he filed his complaint, were statutorily time barred. We affirm.

I.

Between the mid-1920s and early 1930s, Westinghouse supplied three turbines for use at PSE&G's Kearny generating station. The construction of the last of these turbines began in 1932 and was completed more than twenty-five years prior to Donald's first alleged involvement with the turbines. Each of the Westinghouse turbines was a massive structure, with the smallest weighing more than 475 pounds and occupying more than 16,000 cubic feet of space. Each was permanently affixed to the realty by means of a specially constructed concrete foundation. In addition to its role as the designer of the turbines, Westinghouse participated in their construction, with a Westinghouse engineer remaining on site throughout construction and through the initial startup of each turbine.

6

It is undisputed that asbestos insulation was used in the initial design and construction of each Westinghouse turbine. In particular, each turbine was outfitted with custom-designed, asbestos-containing pads or blankets which could be removed whenever the turbine's internal workings needed to be accessed for inspection or repair, and which could be reinstalled at the conclusion of such work.

Donald was employed by PSE&G at its Kearny generating station from 1957 to 1974 and at its Linden station from 1974 until his retirement in 1993. He also worked intermittently at PSE&G's Bergen and Sewaren stations during this period. Donald served in several roles at the PSE&G sites. Beginning in approximately 1961, Donald worked as a helper during periodic overhauls of turbines manufactured by Westinghouse. This required him to remove and reinstall asbestos-containing insulation and blankets in the turbines, likely exposing him to asbestos dust. As an oiler, Donald was exposed to asbestos associated with the turbines in other forms as well, including insulation, block insulation, gasket material, valve packing, asbestos gloves, and rope asbestos. He also served in the maintenance department and as a turbine operator, which regularly exposed him to asbestos.

A-1030-20

The extent to which Westinghouse personnel participated in or supervised overhauls and repairs to turbines it manufactured at the facilities at which Donald worked is in dispute. Westinghouse argues that while its engineers participated in overhauls of newer Westinghouse turbines at other PSE&G facilities, Westinghouse was, by the time of Donald's alleged exposure, no longer participating in any work on the much older Westinghouse turbines at the Kearney facility, which had already reached, or passed, the end of their anticipated lifespan.

However, as a general rule, when Westinghouse personnel participated in turbine overhauls and repairs at a customer's facility, they did so under a contract that specified in detail the services to be provided by Westinghouse employees. In those instances, the removal and replacement of turbine insulation fell solely within the scope of responsibility of the turbine owner, not within the scope of responsibility or supervision contractually undertaken by Westinghouse. While a Westinghouse engineer would routinely remain on site through the startup of the turbine after its overhaul – and, thus, would be present when insulation was reinstalled – he or she generally would not arrive at the site until after the insulation had already been removed by the turbine owner's employees.

8

Notably, even when a Westinghouse engineer was involved in the initial construction of a Westinghouse turbine, he or she would not provide any supervision or direction as to the method and manner in which the insulation used in that construction was to be handled or applied; rather, his or her only interest as to the insulation would be to verify that the end result was in keeping with the relevant design specifications in that the proper types and amounts of insulation had been applied to the correct portions of the turbine. Rather than supervising the turbine owner's employees, a Westinghouse engineer assigned to the overhaul of a Westinghouse turbine generally played a specific and limited role – offering technical advice to the turbine owner and its workers as needed, particularly as to the turbine's complicated internal workings, whose precise tolerances sometimes demanded special expertise to inspect, set, adjust, disassemble or reassemble.

GE custom designed and manufactured four turbines for PSE&G based on PSE&G's specifications. It shipped the turbines in parts for assembly to PSE&G's power plants in Kearney in 1925, 1933, 1936 and 1952; Sewaren in 1948 and 1949; and Linden in 1951 and 1971. These large pieces of machinery are permanent additions to the real property at which they are installed and are

A-1030-20

considered capital improvements. GE provided on-site technical advice during the initial assembly and installation of the turbines.

Considered in the light most favorable to plaintiffs, the record shows that GE's field engineers thereafter also routinely provided on-site technical advice with regard to subsequent repairs to the turbines. The engineers communicated with PSE&G supervisors who then instructed PSE&G employees, including Donald, on how to assemble, install, and repair the turbines. In addition, Donald worked on GE turbines during outages, requiring him to remove and re-install asbestos blankets, block insulation, and asbestos cement.

PSE&G implemented measures to protect its employees from exposure to asbestos. In 1973, PSE&G provided employees with instructions for the use and handling of asbestos products "[i]n order to provide compliance with" Occupational Safety and Health Administration (OSHA) "standards and to prevent the use of asbestos from creating a health hazard to . . . employees." It noted, "[w]here concentrations of asbestos could exceed the limits set, such as when large amounts of insulation are being removed, personal monitoring of an employee on the job shall be arranged between the location and the Safety Engineer's office." PSE&G further required workers to wear protective gear, facilitated OSHA-compliant testing, and implemented safety requirements. The

10

company also mandated employees working with asbestos-containing products receive "instructions explaining the danger to their health and the approved techniques for handling the material."

In 1976, PSE&G issued an "asbestos compliance program" sheet to all managers of its generating stations. The sheet provided outlines for the purchase, disposal, work methods, cleanliness, and personal protection measures taken by the company to prevent asbestos-related health hazards. PSE&G assigned each generating station's maintenance supervisor the task of coordinating employee safety training as to "the approved techniques for handling asbestos," and made each station's safety supervisor responsible for instructing employees about the requirements for wearing personal protection.

In 2015, Donald was diagnosed with mesothelioma and died later that year. Plaintiffs filed an eleven-count complaint in the Law Division, alleging Donald contracted mesothelioma from his contact with asbestos while working for PSE&G from 1957 to 1980. Plaintiffs' allegations are supported by an expert opinion that Donald died from malignant pleural mesothelioma likely contracted from his "extensive exposure to asbestos" without using protective gear.[2]

---

[2] Donald filed the complaint on May 5, 2015. After his death on September 27, 2015, plaintiffs were named in an amended complaint as the co-executors of Donald's estate and as Donald's heirs.

Plaintiffs alleged GE and Westinghouse "mined, milled, manufactured, sold, supplied, purchased, marketed, installed and/or removed asbestos or asbestos-containing products[,] which . . . Donald . . . was exposed to" while working at PSE&G facilities, causing his death. According to the complaint, GE and Westinghouse knew or should have known of the "defective, ultrahazardous, dangerous and otherwise highly harmful" nature of their asbestos-containing products, that those products caused asbestos dust and fibers to become airborne, creating a "dangerous and unreasonable risk of injury to the lungs, respiratory systems, larynx, stomach, and other bodily organs," and that Donald would encounter these products in the course of his employment.

Plaintiffs claimed GE and Westinghouse negligently, recklessly, and intentionally circulated products they knew or should have known were defective or dangerous. They further alleged GE and Westinghouse failed to take reasonable precautions or exercise reasonable care to warn Donald of the asbestos risks; provide reasonably safe and sufficient safeguards to him; properly package products; advise him of the necessity to enforce safe working methods; seek substitute materials without asbestos; advise him to stop further exposure to asbestos; and failed to provide a safe workplace. Plaintiffs alleged GE and Westinghouse ignored and suppressed scientific information relating to

12

asbestos; disregarded medical information about the risk of asbestos and disease; and exposed Donald to the risk of developing asbestos-related diseases.

Before and during Donald's alleged exposure to asbestos, Westinghouse knew that certain types of asbestos exposure in certain settings, e.g., the exposures experienced by factory workers who were continuously exposed to high levels of asbestos dust on a daily basis from a manufacturing process utilizing asbestos as an ingredient, could be harmful if the concentration of such exposures exceeded a certain level of particles per cubic foot of air over a time-weighted average during an eight-hour workday. Accordingly, Westinghouse implemented internal safety procedures for its own plant workers engaged in such asbestos manufacturing processes, designed to limit their exposure to asbestos to below the level of particles per cubic foot of air identified as dangerous. Westinghouse did not, at the time relevant to plaintiffs' claims, believe that the temporary, intermittent asbestos exposures experienced by persons performing or supervising turbine overhauls and repairs presented an appreciable health hazard.

Plaintiffs' industrial hygiene expert analyzed Donald's asbestos exposure and concluded he was not warned or trained about: how to recognize when he was at risk of asbestos exposure or how to protect himself from exposure;

asbestos hazards including cancer and death; asbestos-safe work practices; and what constituted misuse of asbestos containing materials and its resulting debris. PSE&G, GE, and Westinghouse eventually implemented protocols and best practices for the handling of asbestos.

Following discovery, GE and CBS, by then the successor to Westinghouse, moved for summary judgment. They argued that plaintiffs could not establish a negligent supervision claim and that plaintiffs' claims were barred by N.J.S.A. 2A:14-1.1(a), the statute of repose.

On June 29, 2018, the trial court issued an oral decision granting summary judgment in favor of GE and CBS on plaintiffs' negligent supervision claims. The court found that the record established that even if GE and Westinghouse employees were on site at PSE&G facilities providing technical assistance when Donald was working on the overhaul and repair of the turbines, those entities never usurped PSE&G's authority as Donald's employer. The court found no dispute of fact that PSE&G employees undertook the task of removing the thermal insulation blankets and covering the turbines with the blankets under the direction of PSE&G and not GE or Westinghouse. Thus, the court concluded, PSE&G, as Donald's employer, had a non-delegable duty to protect

him from exposure to asbestos and plaintiffs could not establish negligent supervision of Donald by GE and Westinghouse.

The court also found that it is undisputed that the turbines are improvements to real property subject to N.J.S.A. 2A:14-1.1(a). It concluded, however, that while certain parts used during the overhauling and repair of the turbines, such as thermal insulation blankets, were improvements to real property when installed, when those parts were removed and replaced, they lost their status as improvements under the statute. Thus, the court concluded, plaintiffs' claims were not time barred by N.J.S.A. 2A:14-1.1(a). Two June 29, 2018 orders memorialize the trial court's decision.

On July 18, 2018, GE and CBS moved for reconsideration of the July 29, 2018 orders to the extent the court concluded plaintiffs' claims were not time barred. Plaintiffs opposed the motion and cross-moved for reconsideration of the July 29, 2018 orders to the extent the court granted summary judgment to GE and CBS on plaintiffs' negligent supervision claims. Plaintiffs argued GE, Westinghouse, and PSE&G shared a duty to warn Donald about the dangers of asbestos exposure, and emphasized that, as the manufacturer of the equipment, GE and Westinghouse possessed superior knowledge of that danger.

A-1030-20

On December 6, 2019, the trial court issued an oral decision granting GE and CBS's motion for reconsideration. The court found that the record established that the thermal insulation blankets used in the overhaul and repair of the turbines, as well other asbestos-containing components, were specifically designed, essential elements of the turbines and, therefore, improvements under the statute of repose. The court concluded that the blankets and other components did not lose their status as improvements when removed and replaced during overhauls and repairs of the turbines. Thus, the court concluded that plaintiffs' claims arising from the blankets and other components were subject to the statute of repose and time barred. As a result, the court found that summary judgment in favor of GE and CBS on those claims was warranted. The court denied plaintiffs' cross-motion for reconsideration for the same reasons expressed in its earlier decision. Two December 6, 2018 orders memorialize the trial court's decisions.

This appeal followed. Plaintiffs appeal only the trial court's grant of summary judgment as to the negligent supervision claims. They argue the trial court erred because it failed to recognize that, in addition to PSE&G's non-delegable duty to Donald, GE and Westinghouse had an independent duty to warn him of the danger of asbestos exposure. This is so, plaintiffs argue,

16

because GE and Westinghouse employees were present, monitored, and supervised the work done to the turbines. Plaintiffs also argue that GE and Westinghouse had knowledge superior to that of PSE&G and Donald regarding the health risks of exposure to asbestos. Plaintiffs also argue the statute of repose did not apply to their negligent supervision claims because the overhaul and repair work performed on the turbines was performed after the installation of the turbines and did not constitute improvements to real property.

II.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v.

<u>Catrett</u>, 477 U.S. 317, 322 (1986)).  We do not defer to the trial court's legal analysis or statutory interpretation.  <u>RSI Bank v. Providence Mut. Fire Ins. Co.</u>, 234 N.J. 459, 472 (2018); <u>Perez v. Zagami, LLC</u>, 218 N.J. 202, 209 (2014).

III.

We begin with the trial court's grant of summary judgment to GE and CBS with respect to plaintiffs' negligent supervision claims.  "The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages."  <u>Robinson v. Vivirito</u>, 217 N.J. 199, 208 (2014).  For a claim of negligent supervision in particular, the only claim before this court, a plaintiff must show that the employer or other party with a responsibility to supervise an employee "knew or had reason to know that the failure to supervise or train [the] employee in a certain way would create a risk of harm," and that the "risk of harm materialize[d] and cause[d] the plaintiff's damages."  <u>G.A.-H. v. K.G.G.</u>, 238 N.J. 401, 416 (2019).

"The issues of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide." <u>Robinson</u>, 217 N.J. at 208.  "The determination of the existence of a duty of care to avoid harm to another is ultimately governed by fairness and public policy."

18 <span>A-1030-20</span>

Ibid. "The assessment of fairness and policy 'involves identifying, weighing, and balancing several factors – the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.'" Carvalho v. Toll Brothers & Devs., 143 N.J. 565, 573 (1996) (quoting Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993)).

Also, "our jurisprudence recognizes 'foreseeability as a determinant of a [defendant's] duty of care . . . [and] of whether a breach of duty is a proximate cause of an ultimate injury.'" Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 402 (2006) (first alteration in original) (quoting Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 502-03 (1997)). "Although in many cases a duty of care can arise simply from the determination of the foreseeability of harm, usually 'more is needed' to find such a duty, that '"more" being the value judgment, based on an analysis of public policy, that the actor owed the injured party a duty of reasonable care.'" Carvalho, 143 N.J. at 573 (quoting Kelly v. Gwinnell, 96 N.J. 538, 544 (1984)). Therefore, "while actual knowledge of the risk of harm may be dispositive for the imposition of a duty of care, something less in the way of constructive notice may also suffice." Tarabokia v. Structure Tone, 429 N.J. Super. 103, 118 (App. Div. 2012) (citation omitted).

A-1030-20

In Carvalho, a worker was killed when the walls of a deep trench he was working on collapsed.  143 N.J. at 569.  Pursuant to its contract with the project owner, the engineering firm involved was required to have an inspector on site every day to monitor the work progress.  Ibid.  The central issue on appeal was "whether an engineer has a legal duty to exercise reasonable care for the safety of workers . . . when the engineer has a contractual responsibility for the progress of the work but not for safety conditions," yet is aware of dangerous working conditions creating a risk of serious injury to workers.  Ibid.

In deciding whether fairness and public policy imposed a duty on the engineer, the Carvalho Court concluded the foreseeability of risk of injury to workers was evident in the contract between the owner and the engineering firm. Id. at 575, 577.  Because of the "overlap of work-progress considerations and work-safety concerns[,]" the Court found the engineer had a responsibility to ensure compliance with the plans, work progress, and safety.  Id. at 575.  The Court noted "[t]he connection between the engineer's responsibilities over the progress of work and safety measures at the job site is relevant in determining whether it is fair to impose a duty of care addressed to work site safety conditions."  Ibid.  Other factors leading the Court to impose a duty on the engineer included:  the control exerted by the engineer, namely, the presence of

20

a representative on site to monitor work progress and their ability to halt the work; the engineer's knowledge of the unsafe condition and risk of harm; and the ability to avoid the harm.  Id. at 575-78.

In Sykes v. Propane Power Corp., 224 N.J. Super. 686, 690, 695 (App. Div. 1988), we affirmed the dismissal of a wrongful death complaint filed on behalf of a chemical plant employee who was killed in an explosion.  The employee's estate sued an engineering firm the plant hired as an environmental consultant to prepare drawings of the plant's chemical recovery process for submission to the Department of Environmental Protection as part of an effort to demonstrate the plant's compliance with environmental regulations and thereby secure approval for its continued operation.  Id. at 688-89.  The plaintiff alleged the firm breached a duty of care to the employee by preparing and attesting to those drawings, which "reflect[ed] an unsafe and negligently developed chemical processing system," resulting in the plant's continued hazardous operation and, ultimately, the employee's death.  Id. at 692.  But, we concluded the engineering firm had no duty to identify and report hazards because it was not retained to evaluate the safety of the plant.  Id. at 694.  We stated, "the duty to foresee and prevent a particular risk of harm from

materializing should be commensurate with the degree of responsibility which the engineer has agreed to undertake."  Ibid.

We do not agree with plaintiffs' argument that these precedents require reversal of the trial court's orders.  The facts here are different than Carvalho and more like Sykes.  Neither GE nor Westinghouse had a contractual obligation to supervise PSE&G workers during the overhaul and repair of the turbines.  The contractual obligations of GE and Westinghouse were to have field engineers on site at PSE&G facilities to address technical issues associated with the overhaul and repair of the turbines and did not include safety matters, such as warning of the latent effects of the asbestos laden components of the turbines.  PSE&G alone had the duty to ensure safe workplace conditions at their facilities.  The record lacks evidence that either GE or Westinghouse technicians possessed the sort of the control over the worksite as did the Carvalho engineer over the deep trench in which the workers were performing their task.

We agree with the trial court's conclusion that PSE&G, as the owner of the plants at which the overhaul and repair of the turbines took place, had a non-delegable duty to Donald to protect him from the health hazards of exposure to asbestos while working on the turbines.  "[A]n owner of a building has a nondelegable duty to exercise reasonable care for the safety of . . . persons using

22                                                                    A-1030-20

the premises at [their] invitation." <u>De Los Santos v. Saddlehill, Inc.</u>, 211 N.J. Super. 253, 261 (App. Div. 1986). If repairs or structural alterations create a dangerous condition resulting in an invitee's injury, the owner is liable for damages. <u>Mayer v. Fairlawn Jewish Ctr.</u>, 38 N.J. 549, 555 (1962).

We do not agree with plaintiffs' argument that the superior knowledge of GE and Westinghouse of the health hazards posed by exposure to asbestos created a joint duty with PSE&G to protect Donald when he was working on the turbines. As an initial matter, the record does not establish that in the period leading up to 1980, GE and Westinghouse were aware of the health hazards associated with intermittent exposure to asbestos during periodic overhauls and repairs of turbines presented a significant health risk to PSE&G's employees.

IV.

We turn to the trial court's conclusion that plaintiffs' claims are barred by the statute or repose. The statute provides:

> No action . . . to recover damages for any deficiency in the design, planning, surveying, supervision or construction of an improvement to real property . . . or for an injury to the person, or for bodily injury or wrongful death, arising out of the defective and unsafe condition of an improvement to real property, . . . shall be brought against any person performing or furnishing the design, planning, surveying, supervision of construction or construction of such improvement to real property, more than [ten] years after the

23

performance or furnishing of such services and construction.

[N.J.S.A. 2A:14-1.1(a).]

The Court has consistently read the statute "broadly," Horosz v. Alps Est., 136 N.J. 124, 129 (1994), to effectuate its purpose to "prevent 'liability for life' against contractors," Russo Farms, Inc. v. Vineland Bd. of Educ., 144 N.J. 84, 117 (1996). Indeed, as the Court explained:

> [i]f the condition to which the Legislature addressed itself was this extension of potential liability, then there seems no reason not to include within the favor of the statute all to whom this condition may adhere whether they be planners and builders of structures, roads, playing fields or aught else that by broad definition can be deemed "an improvement to real property." We prefer to read the statute, consonant with what we thus judge to have been the legislative intent, as applying to all who can, by a sensible reading of the words of the act, be brought within its ambit.
>
> [Rosenberg v. Town of N. Bergen, 61 N.J. 190, 198 (1972).]

That said, the statute "applies only to work that constitutes an 'improvement to real property.'" State v. Perini Corp., 221 N.J. 412, 426 (2015) (quoting N.J.S.A. 2A:14-1.1(a)). Generally, an improvement is a modification or addition that "permanently increases" the value of real property. Ebert v. S. Jersey Gas Co., 157 N.J. 135, 139 (1999). In determining whether particular

24

work constitutes an improvement to real property, a court should consider "whether the modifications or addition enhances the use of the property, involves the expenditure of labor or money, is more than mere repair or replacement, adds to the value of the property, and is permanent in nature." Perini Corp., 221 N.J. at 426-47 (quoting Ebert, 157 N.J. at 139).  In addition, work necessary for the property to be used for its intended purpose are improvements under the statute.  Newark Beth Israel Hosp. v. Gruzen, 124 N.J. 357, 365 (1991).

There is no dispute that the turbines are improvements within the meaning of the statute and plaintiffs are barred from alleging any claims arising from the turbines' initial design and installation.  The point of contention between the parties is whether any of the subsequent overhauls of and repairs to the turbines also qualify as improvements under the statute.  If they do, it is clear that plaintiffs' claims were filed after expiration of the ten-year limitation period in N.J.S.A. 2A:14-1.1(a).

We have carefully considered the record in light of the controlling legal principles and disagree with plaintiffs' argument that the overhauls of and repairs to the turbines fall outside the statute of repose.  The record establishes that during the overhauls and repairs Donald participated in the removal of

asbestos insulation blankets that were custom-designed, essential elements of the original design of the turbines. Those blankets are integral to the turbines' operation. At the conclusion of the overhauls and repairs, Donald reinstalled the blankets in a manner consistent with the original design of the turbines to ensure that the turbines remained operational. GE and Westinghouse engineers were present during the reinstallation to ensure that the technical requirements for the operation of the turbines were met. The insulation blankets did not lose their status as improvements because they are temporarily removed to effectuate an overhaul or repair of the turbines. Other asbestos-containing components of the turbines to which Donald was exposed during overhauls and repairs were also components of the original design and necessary to the operation of the turbines. We agree with the trial court that they too did not lose their status as improvements during the overhauls and repairs.

Therefore, the statute of repose began to run from the date of the overhauls and repairs during which plaintiffs allege Donald was exposed to asbestos. All of the overhauls and repairs took place more than ten years prior to the filing of the complaint. As a result, we find no basis on which to reverse the trial court orders dismissing plaintiffs' claims as time barred.

A-1030-20

To the extent we have not specifically addressed any of plaintiffs' remaining claims, we conclude they lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1030-20