GRAND STREET ARTISTS,
et. al., Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
et. al., Defendants,

PARKER, et al., Plaintiffs,

v.

GENERAL ELECTRIC COMPANY,
et. al., Defendants.

No. 96–3774 (HAA).

United States District Court,
D. New Jersey.

Aug. 25, 1998.

243

Philip Elberg, Medvin & Elberg, Newark, NJ, for plaintiffs.

Langley R. Shook, Sidley & Austin, Washington, D.C., James A. Moss, Herrick, Feinstein, Princeton, NJ, for defendant GE Company.

Michael Edelson, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for defendant David P. Pascale and Sherrill Pascale.

John F. Semple, Sterns & Weinroth, Trenton, NJ, for defendant John J. Pascale.

Michael Banahan, Gogick & Seiden, West Orange, NJ, for defendant Jenny Engineering Corporation, Inc.

Richard M. Mandel, O'Brien, Liotta & Mandel, Union, NJ, for Enpak Services Co., Inc.

Jack A. Maloof, Maloof, Lebowitz, Connahan & Oleske, Chatham, NJ, for defendant, Environmental Waste Management Associates, Inc.

Peter J. Herzberg, Pitney, Hardin, Kipp & Szuch, Morristown, NJ, for defendant, Rogers Environmental Management, Inc.

Ruth Kirshner, Landman, Corsi, Ballaine & Ford, Newark, NJ, for defendant, Compliance Management, Inc.

John L. Slimm, Marshall, Dennehey, Warner, Coleman & Goggin Marlton, NJ, for defendant, Chasan, Leyner, Tarrant & Lamparello.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter comes before the court upon a motion for summary judgment by the defendant, Jenny Engineering Corp ("Jenny") on several counts: first, plaintiffs' negligence count (Count XVIII of the First Amended Complaint)[1], second, the claim for contribution brought by the defendants and third party defendants, third, the claim for indemnification brought by the defendants and third party defendants, and fourth, defendant David P. Pascale's crossclaim for breach of

1. This case was consolidated with *Parker v. General Electric,* a case brought separately by members of Grand Street Artists ("GSA"). In the *Parker* complaint, the negligence count is asserted in Count XIV.

contract. For reasons detailed below, Jenny's motions on the negligence, contribution, and indemnification claims are DENIED and its motion on David Pascale's breach of contract claim is GRANTED.

## I. Background

In 1993, a partnership formed by artists, Grand Street Artists ("GSA"), purchased the premises at 720–732 Grand Street, Hoboken, New Jersey which had been formerly used for industrial purposes by the defendant Quality Tool & Die Co. ("Quality"). GSA envisioned the building of "customized urban homes" to serve the dual purpose of providing housing to their families and spaces in which they could work. Thus, GSA intended to convert the premises into residential condominium units and working lofts, but were forced to evacuate when mercury contamination was discovered. The Agency for Toxic Substances and Disease Registry issued a public health advisory and found that an "imminent public health hazard is posed to the residents of the premises from past, current and potential future exposures via inhalation of mercury vapors." See Plaintiff's Br. at 14 (quoting Stein Aff., Ex. 18). Thereafter, the plaintiffs, GSA and the individual artists, brought suit against a number of defendants alleging violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), the Environmental Clean Up Responsibility Act ("ECRA"), the New Jersey Spill Compensation and Control Act, the New Jersey Consumer Fraud Act and common law claims for strict liability, negligence, fraud, recission, public nuisance and punitive damages. There are several defendants. First, there are the prior owners of the premises which include General Electric Company ("GE"), Cooper–Hewitt Electric Co., John Pascale, Quality, David P. Pascale, Sherill Pascale. Additionally, there are: Jenny, who assisted Quality in complying with ECRA; Rogers Environmental Management, Inc. ("REM"), an environmental consulting firm hired by GSA to conduct a "Due Diligence Pre–Purchase" report; the law firm Chasan, Leyner,

Tarrant, Lamparello which was retained by GSA for the purchase; ENPAK Services Company, Inc. ("ENPAK"), an environmental testing company hired by GSA to investigate the mercury contamination once it was initially discovered; and Environmental Waste Management Associates, Inc. ("EMWA"), a firm engaged by GSA to advise it on mercury contamination and prepare a remediation plan and solicit bids for removal. Jenny has filed the instant motion.

Before 1954, the Grand Street buildings were owned by either GE or Cooper–Hewitt. Between 1954 and September 1988, Quality operated a tool and die business on the premises. At the end of that period, defendant John Pascale, in his capacity as Quality's principal, decided to terminate operations and to sell all machinery. That decision is where much of this story begins. When John Pascale shut down operations, he did so without following New Jersey's hazardous waste statute, the Environmental Cleanup Responsibility Act ("ECRA") and thus, in a way which was technically improper. The version of ECRA which existed at the time imposes a number of conditions upon the cessation of operations by an owner of an industrial establishment. See N.J.STAT.ANN. §§ 13:1K–1 through 14 (1990).[2] Among other things, an owner who decides to terminate operations must notify the New Jersey Department of Environmental Protection ("DEP") and then submit to an extended ECRA process. At the end of this process, the DEP must give its approval to either a negative declaration stating that the property is not contaminated or to a cleanup plan. Id. By not participating in the ECRA process, John Pascale did not properly shut down operations in September 1988.

Contemporaneously with the termination of operations, John Pascale and his son David were engaged in a protracted legal battle for control of the company. Apparently, John Pascale had brought an action seeking to set aside stock transfers which had been made to his son. The Superior Court found in favor of David Pascale, but the

2. ECRA was amended in 1993 and retitled as the Industrial Site Recovery Act ("ISRA"). See N.J.STAT.ANN. §§ 13:1K–6 (1993).

Appellate Division reversed, and finally, the New Jersey Supreme Court returned control of the company to David Pascale in November 1988. *See Pascale v. Pascale*, 113 N.J. 20, 549 A.2d 782 (1988). For purposes of the instant motion, this see saw battle meant that John Pascale controlled Quality from March 1987 to November 1988—the time when operations were discontinued. Upon his return, David learned of Quality's noncompliance with ECRA and in March 1989, Quality hired Jenny to provide "technical assistance" in the ECRA process. Because Quality's decision to comply with ECRA came one year after the actual shut down, Jenny expressed its concern about incurring legal liability for this failure. Thus, in its proposal, Jenny informed Quality that its "professional services [were] ... for technical assistance in ECRA compliance only, and that ... legal counsel [would] assist [Quality] with any complications resulting from the NJDEP for the overdue submission." *See* Jenny Br. at 4. Specifically, Jenny agreed to perform the following:

1. An evaluation of ECRA applicability which was to involve an assessment of the history of known operations by present and previous owners at the site. Jenny anticipated that most of this information would be provided by the owner.

2. Data collection and review of federal, state, and local government environment permits applied and received at the facility.

3. Preparation of ECRA's "General Information Submission" (known as ECRA–1).

4. Site reconnaissance and mapping identifying activity at the facility and all areas where hazardous substances or wastes have been or currently are generated, transported, treated, stored, handled, or disposed above or below the ground.

5. Preparation of a report describing the operations and processes at the establishment in accordance with the requirements of Item 10 of ECRA's "Site Evaluation Submission" ("SES") (known as ECRA–2). Item 10 covers the "Discharge History of Hazardous Substances and Wastes" at the site.

6. Site evaluations, environmental assessments and the preparation of inventory of hazardous substances, wastes, surface impoundments storage facilities, etc. together with descriptions as required by Items 11 through 13 of the ECRA–2 submission. Items 11 through 13 cover a "Sampling Plan Proposal," "Decontamination/Decommissioning Plan," and "Historical Data on environmental quality at the Industrial Establishment."

7. Development of a Sampling and Testing Plan to be submitted with the ECRA–2 submission.

8. Review of known previous soil, groundwater, surface water and air sampling and testing results, if any, including effluent quality monitoring, conducted at the site during the history of ownership/operations. Data to be provided by Quality.

9. Arrangement and supervision of Underground Storage Tank Integrity Testing.

10. Preparation of necessary maps, drawings, figures for the ECRA–2 compliance and preparation of the ECRA–2 submission.

11. Provide liaison with the client and the DEP, and meet with DEP representative during his site visit.

12. Preparation of a Negative Declaration required by ECRA if the property meets the requirements.

*See* Stein Aff. at Ex. 1 (copy of proposal). Jenny further informed Quality that its work would be "limited to that described herein and [would be] based on the accuracy of statements from the owner as to the site conditions and the history of operations." *See Id.* Between September 30, 1989 and September 30, 1992, Jenny's invoices demonstrate that it engaged in the "preparation of ECRA submissions" and provided "professional services for ECRA compliance." *See* Plaintiffs' Br. at 11 (citing review of Jenny invoices).

On April 23, 1990, Quality submitted an ECRA–1 General Information Statement and an ECRA–2 Site Evaluation Submission. Quality answered "No" to the question of whether the "transaction initiating ... ECRA review" involved a sale. *See* Stein Aff. at Ex. 6 (copy of ECRA–1 Submission). Indeed, there is no question that it was the "cessation of operations" that triggered ECRA. Shortly after making its submissions, the DEP informed Quality that its ECRA–2 submission was incomplete because its answers regarding history, prior ownership and use did not cover the period between 1940 and 1950. With Jenny's help, Quality filed a letter on June 18, 1990 with the DEP indicating that prior to 1950 the building had been operated by GE and Cooper–Hewitt and that the two companies manufactured light bulbs at the site. *See* Stein Aff. at Ex. 9 (copy of letter dated June 18, 1990). The ECRA filing made no mention of any mercury contamination.

Quality terminated Jenny on October 9, 1992 and hired a new environmental consultant to complete the ECRA process.[3] In his letter informing Jenny to stop work, David Pascale expressed that based upon a "turnover in personnel" at Jenny, he lacked confidence in Jenny's ability to complete the project. *See* McDermott Aff. at Ex. E (copy of letter). Thereafter, on December 15, 1992, Quality filed its ECRA "negative declaration affidavit." *See* Stein Aff. at Ex. 5 (copy of negative declaration affidavit).

Based upon Quality's "negative declaration affidavit," there is no question that Quality was seeking DEP approval of its "cessation of operations" and thus, informed that the DEP that there were no potential sellers or buyers. *Id.* The DEP reviewed the submissions and granted its approval in February 1993, but limited its approval to the "cessation of operations." *See* McDermott Aff. at Ex. H (copy of approval).

Beginning in at least 1993, GSA began considering the purchase of the premises and it decided to retain Rogers Environmental Management, Inc. ("REM"), an environmen-

tal consulting firm to conduct a "Due Diligence Pre–Purchase." This "Due Diligence Pre–Purchase" involved an examination of the premises to determine whether they could be safely converted to residential use. *See* Stein Aff. at Exs. 19,21 (copies of the "understanding" between REM and GSA and REM's report and correspondence outlining nature of services). As part of its due diligence, REM reviewed Quality's ECRA case file and concluded that the level of contamination met current "Cleanup Standards." *Id.* at Ex. 21. REM advised GSA that the property was suitable for development as a residential project. In August 1993, Quality sold the premises to GSA. GSA alleges that it relied upon this recommendation when it purchased the premises. In 1996, after mercury was discovered, the DEP rescinded its approval.

In the instant case, the plaintiff has brought a negligence claim against the defendant Jenny on the ground that the ECRA submissions were "materially false and misleading" in that they filed to identify the mercury contamination. According to plaintiffs, Jenny should have discovered the "48 year history of mercury-related manufacturing operations" and the "pervasive[ ]" mercury contamination. Thus, plaintiffs contend, Jenny breached a "duty of due care which it owed to plaintiffs by failing to conduct its environmental audit ... in an independent manner and in accordance with generally accepted standards...." Grand Street Artists First Amended Complaint, Count XVIII at ¶¶ 181–184. For purposes of this motion, it also important to note that the other defendants and third party defendants have also filed claims for contribution and indemnification against Jenny and that David Pascale has filed a cross claim against Jenny for breach of contract.

Jenny argues that it merely provided assistance to Quality in facilitating its "cessation of operations" under ECRA, and thus, it owed no duty to prospective purchasers. Additionally, it argues that because it did not have a duty, it cannot be held liable for

---

**3.** It appears from the record that Rose Mehrtens, a former employee of Jenny, took over the responsibility of providing ECRA assistance to

Quality. *See* Plaintiff's Supplemental Br. at n. 2 (citing David Pascale Deposition at 182:13–16).

contribution or indemnification. Finally, Jenny has moved to dismiss defendant David Pascale's Sixth Cross Claim for breach of contract. Jenny argues that Pascale was not an intended beneficiary of the contract for ECRA assistance executed by Quality.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.), *cert. dismissed*, 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). In other words, "summary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988).

The substantive law will identify which facts are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *Id.*

The party seeking summary judgment always bears the initial burden of production, i.e., of making a *prima facie* showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not produced evidence relating to an essential element of the issue for which it bears the burden. *Id.* at 322–23, 106 S.Ct. 2548. Once either showing is made, the burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. *Id.* at 324, 106 S.Ct. 2548.

■ However, at the summary judgment stage, a court may not weigh the evidence or make credibility determinations—these tasks are left to the factfinder. *Petruzzi's IGA v. Darling–Delaware*, 998 F.2d 1224, 1230 (3d Cir.), *cert. denied*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Therefore, to raise a genuine issue of material fact, " 'the [summary judgment] opponent need not match, item for item, each piece of evidence proffered by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.See also Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")." "Although a 'scintilla of evidence' supporting the nonmovant's case is not sufficient to defeat a motion for summary judgment, it is clear that a district court should not weigh evidence and determine the truth of the matter itself, but instead should determine whether there is a genuine issue for trial." *Country Floors, Inc. v. Country Tiles*, 930 F.2d 1056, 1061–62 (3d Cir.1991).

If the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, then summary judgment may be granted.

## III. Discussion

### A. Plaintiffs' Negligence Claim

■ The question here is whether a defendant/environmental consultant who provides ECRA assistance to an owner who wishes to cease operations owes a duty to a plaintiff who has relied upon a review of the owner's ECRA submissions in making the decision to purchase the premises and convert them for residential use. The New Jersey courts have never addressed this issue and thus, this court must predict what New

Jersey Supreme Court would decide. *See McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980) (Where the New Jersey Supreme Court has not squarely addressed the issue at bar, the federal court sitting in diversity "must be governed by a prediction of how the state's highest court would decide were it confronted with the problem."). In New Jersey, the existence of a duty is a "matter of law properly decided by the court." *See Carvalho v. Toll Brothers and Developers,* 143 N.J. 565, 572, 675 A.2d 209 (1996). Ultimately, the "question of whether a duty exists in a particular case is a question of fairness and policy that implicates many factors." *Id.; see Snyder v. American Association of Blood Banks,* 144 N.J. 269, 292, 676 A.2d 1036 (1996). Among these factors, the foreseeability of injury to others from defendant's conduct is the most important. *See Carvalho, supra.* The "foreseeability" factor does not, by itself establish the existence of a duty, but it is a "crucial element in determining whether imposition of duty ... is appropriate." *See Id.* at 573, 675 A.2d 209. "Once the foreseeability of an injured party is established ... considerations of fairness and policy govern whether the imposition of a duty is warranted." *Id.* At this stage, the court must identify, weigh and balance several factors which include: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." *Id.* While there is a connection between the concept of foreseeability and the other factors, the "foreseeability of harm is susceptible to an objective analysis, while the resolution of fairness and policy is a much less certain determination." *Id.* The magnitude and likelihood of potential harm are objectively determinable, but the propriety of imposing a duty of care is not. *See Weinberg v. Dinger,* 106 N.J. 469, 485, 524 A.2d 366 (1987).

In the instant case, plaintiffs contend that Jenny owed a "duty of care to the ... prospective purchasers of the Premises, to file ECRA submissions that were truthful, accurate and complete and to perform its professional environmental consulting services in a reasonably competent manner" solely because Quality hired it to prepare ECRA submissions. *See* Plaintiff's Br. at 17. Plaintiffs allegedly breached that duty when it assisted Quality in filing ECRA submissions which were "materially false and misleading" in that they failed to disclose any mercury contamination on the premises. *Id.* In order to determine whether defendants owed a duty to prospective purchasers, the court must first consider the foreseeability of injury.

■ Although it is well settled that an environmental consultant must conform to a standard of care possessed by members of the profession in good standing, it only owes a duty to those persons who fall normally and generally within a zone of risk created by the tortious conduct and are therefore foreseeable. *See Sykes v. Propane Power Corp.,* 224 N.J.Super. 686, 541 A.2d 271 (App. Div.1988). This does not "require a specific forecasting of particularly identifiable victims...." *See Id.* "That a plaintiff may be found within a range of harm emanating from tortfeasor's activities is more significant than whether the parties stand in a direct contractual relationship." *Carter Lincoln–Mercury Inc., Leasing Division v. EMAR Group, Inc.,* 135 N.J. 182, 638 A.2d 1288 (1993). Lack of privity is no bar to recovery. *See Id.*

In the absence of any New Jersey authority on this issue, the court looks for guidance to the jurisprudence dealing with the liability of professionals such as lawyers and accountants to third parties. *See Petrillo v. Bachenberg,* 139 N.J. 472, 655 A.2d 1354 (1995). In *Petrillo, supra,* an attorney prepared and delivered a misleading percolation test report to his client's real estate broker who thereafter distributed the report to a prospective purchaser. The court held that the attorney owed a duty to the prospective purchaser because the attorney provided the report to the broker in connection with his client's efforts to sell the property, and thus, it could be inferred that the attorney knew or should have known that the broker might deliver it to a prospective purchaser. In making its findings, the court focused upon the "objective purpose" of the work performed. *See Id.* at 485, 655 A.2d 1354. Similarly, this

court must focus upon the "objective purpose" of Jenny's services. On that issue, there is much dispute between the parties.

What makes the instant case so difficult is that Quality's initial retention of Jenny was precipitated by the fact that it had terminated its operations in 1988 without following ECRA, and not necessarily by an actual sale to GSA. This case might be an easier one to decide if Jenny had provided ECRA assistance to Quality in relation to the GSA sale. To understand the importance of this distinction, an examination of ECRA's mechanics is necessary.

ECRA's unique approach to solving the hazardous waste problem implements "market forces to bring about the reversal of environmental pollution." *Dixon Venture v. Joseph Dixon Crucible Co.*, 122 N.J. 228, 231–32, 584 A.2d 797 (N.J.1991). ECRA makes the transfer or the closure of an "industrial establishment" contingent upon compliance with the Act and thereby, internalizes the cost of clean-up within those transactions. *See* N.J.STAT.ANN. § 13:1K–11(a); Walsh and Bramson, *Triggering the Internalization of the Social Costs of Hazardous Wastes*, 1990 COLUM.BUS.L.REV. 415, 433 (1990). Whether the ECRA process is triggered by a sale or the cessation of operations, the owner must file a General Information Submission ("GIS") ("ECRA–1 Submission") and a Site Evaluation Submission ("SES") ("ECRA–2 Submission"). Upon closure or within sixty days before a transfer or sale, it must submit either a negative declaration stating that the property is not contaminated or a cleanup plan for DEP approval. The DEP must then decide whether to approve or reject the plan. *See* N.J.STAT.ANN. § 13:1K–9; *In Re Adoption of N.J.A.C. 7:26B*, 128 N.J. 442, 608 A.2d 288 (1992). The DEP regulations in effect at the time of Quality's filings provided that the agency would approve negative declarations and clean up plans on:

> a case-by-case basis for soil, ground water and surface water quality necessary for the cleanup of the industrial establishment ... to ensure that the potential for harm to the public health and the environment is minimized to the maximum extent practicable,

taking into consideration the location of the industrial establishment.

. . .

N.J.A.C. § 7:26B–11.1 (1988).

Thus, ECRA imposes a number of obstacles on a road leading to a number of destinations which range between the cessation of operations and the sale of the premises. Each time that an owner wants to engage in one of the transactions covered by the statute, it must comply with ECRA. ECRA does not allow an entity who has successfully completed the ECRA process on a previous occasion to rely upon that fact when the process is triggered again. That means that an owner who closes operations and thereafter sells the premises must comply with ECRA twice. When an environmental consultant agrees to assist an owner in ECRA compliance, the underlying purpose of the consultant's work is to facilitate a particular transaction whether that be the cessation of operations or the sale of the property. By design, ECRA has rendered the clean-up of hazardous waste a byproduct of the transaction. In the instant case, the DEP's February 1993 approval of the negative declaration permitted Quality to shut down operations, but it did not authorize a sale of the premises.

Here, plaintiff wants to argue that the legislative purpose of ECRA—to protect the public from the risk of hazardous and toxic substances—is enough to establish a duty to any member of the public. *See* Plaintiff's Br. at 21. Following plaintiff's interpretation, any environmental consultant who performed ECRA related services would be liable to any member of the community, especially prospective purchasers, for any harm caused by contamination not discovered during the ECRA process. The court finds this view to be somewhat overbroad because it confuses the underlying purpose of Jenny's services with ECRA's precatory mission of eradicating hazardous waste. While there is overlap between the two, they are not necessarily interchangeable. The proper analysis of Jenny's liability must employ a more precise definition of the underlying purpose of Jenny's services.

In the instant case, Quality hired Jenny in March 1989 because it wanted to properly

cease operations. The question then becomes whether it is foreseeable that prospective purchasers will rely upon ECRA submissions in deciding whether to purchase premises. Certainly, there is nothing in the record which indicates that Quality informed Jenny that it intended on selling the premises. However, there is some indication that Jenny knew that the premises would be sold once the ECRA process was completed. *See* Plaintiff's Supplemental Response (quoting Pasha Deposition); Stein Supplemental Cert., Ex. B. According to Syed Pasha, a "former Senior Geologist for Jenny and the person principally responsible for the environmental consulting services rendered," it was his "understanding" that after the ECRA process was completed, Pascale would sell the premises. *Id.* at 2.

Although Quality's ECRA submissions were not triggered by a sale of the premises, given the structure of ECRA and the ECRA process, it was foreseeable that prospective purchasers would rely upon the ECRA submissions. Practically speaking, whether an owner is ceasing operations or selling the premises, the necessary steps prescribed by ECRA are identical. In each, the owner must file ECRA–1 and ECRA–2 submissions and a Negative Declaration. Each must address the same history. In many circumstances, the cessation of operations is just the first step in an attempt to sell the premises. The Act itself does not distinguish between the two. In the "Definitions" section itself, ECRA does not define the terms separately, but rather considers them together in one phrase, "[c]losing, terminating or transferring operations means...." *See* N.J.Stat.Ann. §§ 13:1K–8(b). From the structure of ECRA, Jenny should have known its work would have been used by others interested in purchasing the premises. These ECRA submissions are public filings which were easily accessible to prospective purchasers. Thus, it was foreseeable that a potential purchaser would look to the prior ECRA submissions in considering whether to enter into the transaction.

In its brief, Jenny has argued that it could not anticipate the prospect of liability to purchasers who intended to convert the premises for residential purposes because the DEP guidelines differed as to premises which were to be used for residential purposes in contrast to those applicable where operations at a former industrial site are shut down. That argument is not persuasive. While the DEP might have imposed different standards of approval when the premises were converted for residential purposes, the process for compliance was the same. Therefore, it was foreseeable that a prospective purchaser would examine the results of a previous ECRA submission even if that prior application process had only resulted in an approval for cessation of operations. As I have already noted, to establish a duty, there need not be a "specific forecasting of particularly identifiable victims or a precise prediction of the exact harm." *See Sykes, supra,* at 693, 541 A.2d 271. Here, it was foreseeable that Quality would eventually sell the premises and that Jenny's services would be used for that purpose. It was not necessary for Jenny to know of an actual sale or that the premises would be converted for residential use.

Jenny has also relied substantially upon *Bronstein v. GZA GeoEnvironmental,* 140 N.H. 253, 665 A.2d 369 (N.H.1995) to argue that plaintiff's reliance was not foreseeable. However, that case is distinguishable. In *Bronstein,* Bronstein entered a purchase and sale agreement and then hired an environmental firm, GZA, to conduct an environmental study of the premises. Bronstein later assigned his rights under the agreement to the plaintiff who purchased the property. When the plaintiffs discovered contamination on the property, they filed an action against GZA. The court held that GZA did not owe a duty to the plaintiffs because GZA's agreement with Bronstein explicitly stated that the report was prepared "for the exclusive use of Bronstein" and that dissemination beyond Bronstein's lender and title insurer was forbidden without GZA's prior consent. *Id.* at 257, 665 A.2d 369. The court further noted that the report itself contained the limitation on dissemination and that it would not be "reasonably foreseeable that information supplied to a lender by a potential purchaser would be transmitted by that lender to other purchasers." *Id.* In the instant case, Jenny

did not explicitly limit the use of the report. Moreover, Jenny's work was used to comply with regulations that were equally applicable in the sale context.

In further contrast to *Bronstein,* Jenny did not take any affirmative steps to limit the reliance by others upon its work. Contrary to Jenny's argument, the consulting firm did not expressly limit its work to the "cessation of operations." Unquestionably, Quality hired Jenny because by shutting down its operations, it had triggered ECRA, but by participating in the ECRA process, the product of its work became available to the public. Short of some type of legislative action, it would be impossible to preclude the public from examining ECRA submissions. Thus, it was reasonably foreseeable that future purchasers would rely upon Quality's successful ECRA submissions.

Jenny has also relied upon *Sykes, supra,* to support its argument that its ECRA work served a limited purpose. In *Sykes, supra,* an engineer was hired for the purpose of obtaining an operating permit for a chemical recovery plant. When a chemical distillation unit exploded resulting in the death of an employee, the adminstratix of the estate claimed that the engineer had been negligent and was therefore, liable. The papers compiled by the engineer for purposes of compliance related to the chemical discovery process in that it included photographs of the processing systems and diagrams of the system components. The court held that because the engineer had not been retained to evaluate the safety of a chemical processing plant but only to prepare a basic graphical layout of the existing processing systems which was necessary to comply with the regulations, the engineer could not be held liable. According to the court, the "duty to foresee ... should be commensurate with the degree of responsibility which the engineer has agreed to undertake." *Id.* at 694, 541

A.2d 271. Because the engineer had not taken on the responsibility of evaluating the safety of the plant, the court held, the imposition of a duty would be contrary to principles of tort law. *Id.*

Here, Jenny was retained for the purpose of obtaining ECRA approval and was responsible for assisting Quality in the discovery of hazardous waste. Jenny's work was equally applicable within the sale context. Unlike *Sykes,* the plaintiff is not asking the court to assign the defendant responsibility beyond that for which it was originally retained. The plaintiff in *Sykes* argued that the engineer should have evaluated safety, a task which it was never asked to do. Here, the plaintiffs contend that Jenny should have discovered mercury contamination, a task which it was asked to perform.[4]

Jenny has also raised a number of fairness and policy arguments. First, it argues that by finding a duty to "remote and future purchasers," the court will "affect an equally inefficient allocation of professional responsibilities." *See* Plaintiff's Br. at 23. According to Jenny, "[f]uture purchasers regardless of the number of real estate transactions occurring before them, will be permitted to assert claims against environmental professionals" and will expose environmental professionals to an unlimited class of plaintiff and limitless liability. *See Id.* Initially, I note that the plaintiffs in this case are not "remote." They are the ones who purchased the premises, a purchase which I have already held, was foreseeable. The court's finding of a duty does not extend beyond "those persons who fall normally and generally within a zone of risk created by the tortious conduct" and therefore, plaintiff's argument fails. *See Sykes v. Propane Power Corp.,* 224 N.J.Super. 686, 541 A.2d 271 (App.Div.1988). That the magnitude of the liability may be great does not by itself provide enough of a reason

---

**4.** The court recognizes that there is some debate over the nature of Jenny's duties. The parties disagree over who was supposed to compile the history of prior use. However, there does not appear to be any debate that Jenny was responsible for evaluating the possibility of contamination based upon that history. Plaintiffs contend that just by the fact that GE and Cooper operated light bulb manufacturing businesses, Jenny should have known about the mercury contamination. While the question of whether Jenny should have known about the contamination is a question of fact, the amount of responsibility alleged is no greater than that which Jenny assumed.

for not finding a duty. Environmental harm is often substantial.

In Jenny's final argument, it argues that had the plaintiffs properly investigated the premises, they would not have needed to rely upon Quality's ECRA submissions. According to Jenny, CERCLA and New Jersey's Spill Act compelled the plaintiffs to conduct their own environmental due diligence of the premises. Additionally, Jenny notes, that like ECRA, the amended version known as ISRA entitles a purchaser to void the sale upon the seller's failure to "perform a remediation and obtain department approval." *See* N.J.STAT.ANN. §§ 13:1K–13(a)(1998). Because plaintiffs did not take these steps, Jenny argues it should not be held liable. However, because this argument relates more to causation than to duty, it will not be considered at this time. Jenny's argument may provide reason for why its actions did not cause plaintiff's damages, but it does not undermine the court's finding of duty.

Jenny has analogized to *Smith v. Boyd,* 272 N.J.Super. 186, 639 A.2d 413 (App.Div. 1993) to argue that because ECRA afforded GSA a remedy to void the sale, the court should not find a duty. In *Smith,* the buyer in a foreclosure sale brought an action against the Title Insurer who had failed to disclose an open first mortgage in its title report. The report had been prepared in processing the foreclosure. The court held that because New Jersey law permitted a buyer to be relieved from a bid "before delivery of the deed," it could not bring a negligence claim against the title insurer after the deed was delivered. *Id.* I find Jenny's argument unavailing because there are no similarities between the two cases beyond the fact that they both involved the reliance upon a report.

The court's finding of a duty in the instant case is predicated upon its understanding of ECRA and its conclusions are informed by the unique structure of that statute. Jenny has failed to identify any similarities between the ECRA's regulatory regime and the foreclosure context. In *Smith* the court's reasoning is partially based upon the fact that the statutory remedy afforded to a buyer only exists before the delivery of the deed.

However, under ECRA, a buyer may bring an action to void a sale of transfer after the transaction has taken place. Most importantly, it is crucial to the finding in *Smith* that the foreclosure statute had retained the principle of caveat emptor. *See Id.* at 194, 639 A.2d 413. The same cannot be said for ECRA. Thus, Jenny's argument must be rejected. Finally, for reasons already stated, reliance upon Quality's ECRA submission was foreseeable.

There are two other factors which support a finding of duty. First, there is no question that the public has an interest in the proper compliance with ECRA to protect it against hazardous waste. *See Dixon, supra.* Second, there is some indication that Jenny knew that the premises would be sold once the ECRA process was completed. As I have already noted, Syed Pasha, the former Jenny geologist, has stated that it was his "understanding" that after the ECRA process was completed, Pascale would sell the premises. *See* Stein Supplemental Cert., Ex. B; discussion, *supra* at 14. This evidences some awareness by Jenny of the risk of harm presented by its actions. *See Carvalho, supra,* at 576, 675 A.2d 209 ("[A]ctual awareness of knowledge of the risk of harm is also significant in determining the fairness in imposing a duty of care."). Thus, the court finds that consideration of fairness and policy require the imposition of duty on Jenny.

Notably, however, while a duty existed, it is axiomatic that Jenny can only be negligent for that which it was responsible. *See Sykes, supra.* That means that Jenny cannot be expected to have done work beyond that which is required by its contract and that which its professional duty requires for the purposes of gaining DEP approval of the cessation of operations. Additionally, there remains some question of fact as to what exactly Jenny was required to do to satisfy the contract and professional standards, but the court need not resolve that dispute at this time. For reasons stated above, Jenny's motion shall be **DENIED.**

### B. Claims Against Jenny for Contribution and Indemnification

Jenny has also moved to dismiss the claims for contribution and indemnification filed by

each defendant and third-party defendant. However, Jenny's arguments are premised upon its belief that it owes no duty to the plaintiffs. Because I have held that such a duty existed, Jenny's motion must be **DENIED**.

*C. David Pascale's Intended Beneficiary Cross–Claim*

 Finally, Jenny has moved to dismiss David Pascale's sixth cross-claim. Pascale contends that as an intended beneficiary of Quality's contract with Jenny, Pascale is entitled to assert a breach of contract claim. What makes this case somewhat odd is that it was David Pascale who executed the contract as Quality's president. In addition to controlling Quality, Pascale owned the property upon which Quality operated. Pascale claims that he was made an intended beneficiary of the contract in his personal capacity as owner of the premises as opposed to in his capacity as Quality's president. I find that argument wholly unpersuasive.

 A plaintiff asserting third party beneficiary status must establish that the contract was "made for the benefit of that third party within the intent and contemplation of the contracting parties." *Grant v. Coca–Cola Bottling Co.*, 780 F.Supp. 246 (D.N.J.1991). New Jersey courts have made the contractual intent to recognize a right to performance in the third person the key analytical factor. *See Broadway Maintenance Corp. v. Rutgers*, 90 N.J. 253, 259, 447 A.2d 906 (1982). Without the requisite intent, the third person is merely an incidental beneficiary without contractual standing. *See Id.* A plaintiff must:

> show more than that the contracting parties acted against a backdrop of knowledge that the plaintiff would derive benefit from the agreement. The plaintiff must show the benefit to the plaintiff was a consequence the parties affirmatively sought; in other words, the benefit to plaintiff must have been, to some extent, a motivating factor in the parties' decision to enter the contract. *Id.* (quoting *Corrugated Paper Products v. Longview Fibre Co.*, 868 F.2d 908, 912 (7th Cir.1989) (interpreting New Jersey law)).

To decide whether the contracting parties intended to make David Pascale an intended beneficiary, the court must look to the terms of the agreement and the surrounding circumstances. *Grant, supra*, at 249; *Broadway Maintenance, supra*.

In the instant case, both parties agree that Jenny's original proposal made to Quality comprises the terms of their contract. *See* Stein Aff. at Ex. 1 (copy of proposal). The exact nature of these services are outlined above. *See* discussion, *supra* at 245. The question here is whether the contract intended to make David Pascale a beneficiary of the services. While David Pascale was the owner of the premises, there is no question that David Pascale filed the ECRA submissions in his capacity as president of Quality. No one contends that the cessation of operations triggered the need for David Pascale to comply with ECRA in his personal capacity. Nevertheless, Pascale posits that he was an intended client of Jenny.

Certainly, there is no explicit language in the proposal which makes Pascale an intended beneficiary of the contract. Pascale makes much of the fact that Jenny submitted its proposal "in accordance with your request for professional services to assist you in your obligations" under ECRA. *See* Pascale Br. at 16. ECRA required that the "owner or operator of an industrial establishment" comply with the Act and the ECRA submissions named David Pascale as one of the owner/operators of the industrial establishment. According to Pascale, that meant that when the proposal used "you" and "your request," there was an intent to provide services to both Quality and David Pascale. The court rejects that argument. Based upon Pascale's logic, every time that a company's president executed a contract on behalf of the company, the president would be an intended beneficiary.

There is no question that David Pascale is the one who made the request and the court cannot imagine how a corporation could make a request without some communication between humans, but the contract's use of "you" and "your" refers to the person responsible for the entity which must comply

with ECRA. The sole focus of the contracting parties was on the facilitation of the cessation of operations under ECRA. There is no evidence that at the time of contracting, the parties believed that David Pascale needed to comply in his personal capacity. Thus, the contractual intent of the parties was solely to benefit Quality and not David Pascale, individually.

Pascale has not identified any other factors which would undermine the court's conclusion. First, Pascale makes much of the fact that "a critical and central aspect of the work to be performed by Jenny involved decommissioning [an] oil tank" located under the parking lot of the premises. *See* Pascale Br. at 6. As Pascale notes, the tank was not a part of the space occupied by Quality within the building, but instead a fixture of the property owned by Pascale. While this may have had an incidental benefit to Pascale in his individual capacity, the motivating factor underlying the work was ECRA compliance. *See Grant, supra,* at 249 (benefit to plaintiff must have been, to some extent, a motivating factor in the parties' decision to enter the contract). Second, Pascale notes that the "ultimate outcome of the ECRA process was to be a Declaration of Environmental Restrictions and Grant of Easement" ("DERGE") which must be signed by the owner of the land, who in this case, was David Pascale. *See* Pascale Br. at 17. Nevertheless, this does not demonstrate anything more than that Pascale was an incidental beneficiary. Jenny's services were motivated by a need for Quality to comply with ECRA, notwithstanding the fact that such compliance involved participation by Pascale.

Finally, Pascale argues that he was an intended beneficiary because Jenny knew that he would be personally exposed to liability under ECRA. Pascale relies upon § 13:1K–13(c) which provides that "any officer or management official . . . who knowingly directs or authorizes the violation of any provisions of this act shall be personally liable." *See* N.J.STAT.ANN. §§ 13:1K–13(c). That ECRA makes an officer personally liable in some rare cases does not mean that a contract for environmental services makes him an intended beneficiary. Such a reading of the law makes no sense, especially when one notes that section § 13:1K–13(c) also establishes individual liability for "[a]ny person who knowingly gives or causes to be given any false information. . . ." *Id.* Certainly, any argument raised by the people identified in that section that they were entitled to intended beneficiary status based upon the existence of that ECRA provision would strain credulity. *Id.* The logic behind such a claim is indistinguishable from that of Pascale. For these reasons, Pascale's argument must fail.

 As the court noted in *Grant, supra,* at 249, "[f]oreseeability of a prospective benefit to a third party is not enough to establish a third party's rights." Pascale has demonstrated nothing more than such a benefit. Thus, Jenny's motion shall be **GRANTED**.

*IV. Conclusion*

For reasons detailed in the opinion above, Jenny's motion to dismiss David Pascale's breach of contract claim is **GRANTED** and Jenny's remaining motions for summary judgment are **DENIED**.